IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS


IN RE CENTRAL STATES MECHANICAL,

Debtor,


CENTRAL STATES MECHANICAL, INC.,

Plaintiff/Appellant,


vs.                                    Case No. 11-1129-JTM


AGRA INDUSTRIES, INC.,

Defendant.


MEMORANDUM AND ORDER

This bankruptcy appeal arises from an adversary proceeding centering on the construction of two biofuels plants in Iowa. The general contractor of the projects, Agra Industries, Inc., subcontracted with debtor Central States Mechanical for Central to perform the extensive piping work required for the plants. Under the two Subcontracts, Central would be paid up to $25 million for its work on the first plant, constructed for Great Plains Renewable Energy (GPRE) at Superior, Iowa and the second, constructed for Plymouth Energy, LLC at Merrill, Iowa. Substantial delays occurred in the construction of both plants, and eventually Central walked off job at the Plymouth site. Both parties have presented claims for damages based on contract or quasi-contract theories.

The matter was tried to the Bankruptcy Court over the course of two weeks. The court ultimately ruled in favor of Agra. With the relatively minor exception of Central's $242,535 claim for payment for a water treatment facility at the Superior plant, the Bankruptcy Court disallowed most of Central's claims, and granted judgment to Agra for $3 million the costs of completing Central's work at the Plymouth plant.

Central appeals, arguing that the Bankruptcy Court erred, first, in disallowing its claims of economic impact damages and claims based on disputed Change Orders for Agra's alleged breaches of contract and bad faith in the execution of the Superior Subcontract, and for failing to grant these claims under various quasi-contract theories. Second, it argues that the Bankruptcy Court erred in failing to award its claims as to the Plymouth Subcontract. Third, it argues that the Bankruptcy Court erred in granting damages to Agra for the costs of completing the Plymouth work. Finally, it argues that the Bankruptcy Court erred in failing to grant it attorney fees.

This court finds that Central's allegations of error are without merit, and the judgment of the Bankruptcy Court is hereby affirmed.

### Standard of Review

In reviewing the decision of the Bankruptcy Court, the district court "sits as an appellate court." *United States v. Domme* (*In re Domme*), 163 B.R. 363, 365 (D.Kan.1994) (citing 28 U.S.C. § 1334(a)). The court reviews *de novo* the conclusions of law of the bankruptcy ocurt. *United States v. Richman* (*In re Talbot*), 124 F.3d 1201, 1206 (10th Cir.1997).

2

In contrast, the court must accept the factual findings of the Bankruptcy Court unless those findings are clearly erroneous. *Securities Investor Protection Corp. v. Stellatos* (*In re Blinder, Robinson & Co.*), 124 F.3d 1238, 1241 (10th Cir.1997); *In re Reid*, 757 F.2d 230, 233 (10th Cir. 1985). *See* Bankr. Rule 8013. A finding is clearly erroneous if it is not supported by any evidence, or if the appellate court, after reviewing all of the facts in the case "is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948). Where the evidence permits two differing views, the fact-finder's choice between them cannot be clearly erroneous. *Anderson v. Bessemer City*, 470 U.S. 564, 573–74 (1985) (citations omitted). Finally, "due regard shall be given to the opportunity of the Bankruptcy Court to judge the credibility of the witnesses." *Wittman v. Toll* (*In re Cordry*), 149 B.R. 970, 974 (D.Kan.1993).

Given this deferential standard for the factual findings of the Bankruptcy Court, it is remarkable that the appellant Central devotes over half its 81-page brief to a separate factual narrative, telling its version of the construction of the Superior and Plymouth Plants, based on the testimony of its own witnesses. (Dkt. 24, at 4-49). This court is not permitted to substitute its own judgment as to the facts of the case; it must decide whether the factual determinations actually rendered by the Bankruptcy Court are clearly erroneous. Central has completely failed to show that any of those factual findings are unsupported in the evidence.

The 127-page opinion of the Bankruptcy Court summarized the findings of fact and conclusions of law rendered by the court after hearing the testimony of eleven witnesses

given over two weeks. The record of the trial includes 2300 pages of transcript testimony, along with 385 separate exhibits. This court has reviewed all of the evidence in the action, and finds that the factual determinations of the Bankruptcy Court are well-supported. None are clearly erroneous.

*Factual Background*

With respect to the Superior Project, Central sought (1) the unpaid balance of the $11.8 million contract maximum price; (2) impact damages of $1,136,608, for its costs because of delays, work changes, and acceleration; (3) $242,535 reflecting the unpaid costs of its water treatment plant work; (4) $149,063 for extra work allegedly done at Agra's direction but without an approved Change Order; and (5) attorney fees. For the Plymouth Project, Central sought payment of the value of its work, claiming that Agra breached the Subcontract by creating delays which prevented its performance, by wrongfully terminating the agreement, breaching the implied covenant of good faith and fair dealing, and under the doctrine of *quantum merut*.

For the Superior Project, the evidence showed that the December 15, 2006 standard form Subcontract provided that Central would perform the extensive piping work required for the biofuels plant, with the work to be substantially complete by November 18, 2007. In exchange, Agra would pay Central the "Cost of the Work" along with a 12% fee, up to a Guaranteed Maximum Price (GMP) price of $11,898,368. The contract maximum price included a $250,000 contingency fee allowance for Central, with any unused portion

4

reverting to Agra.  The parties anticipated some delays, as the design and construction of the project were run along parallel paths, and the date of substantial completion was extended, first to January 11, 2008, and later to March 8, 2008.

The Subcontract incorporated the Terms and Conditions of the Prime Contract between Agra and the plant owner, Green Plains Renewable Energy. The Subcontract prohibited modifications except by signed agreement.     Central could obtain extensions of the work deadline by giving timely, three-day notice of a delay which was caused by Agra or which was otherwise excusable. Under § 3.4.1, Central waived any right for extension by failing to give timely notice of a delay. If the request was timely, Agra could extend the deadline by an approved Change Order under § 5.3. Central could also receive more than the $11.9 million contract maximum, but only if it sought and obtained a Change Order approved by Agra.

The Subcontract required that requests for Change Orders be submitted "promptly" by Central, on an approved form, and Agra was to expedite consideration of such requests. If Central wished more time to complete work, the Terms and Conditions of the Prime Contract provided that Central should give Agra a "Delay Notice" within seven days of an "Excusable Event of Delay," and a "Delay Claim" within fourteen days. If Central sought payment for added costs, it was obliged to seek a Change Order by written notice within 21 days of the event causing the claim.

The Superior Project was marked by substantial delays, largely through the failures of Agra's design consultant, Delta-T Corporation, which was frequently late in supplying

necessary Process and Instrument Drawings, along with valves and other equipment. In addition, the plant owner determined that a new water treatment plant was needed on the site, and Agra approved a Change Order for Central to build the piping for that plant.

Central submitted delay claims to Agra over the water treatment plant, but these were untimely under the terms of the Subcontract. At the same time, as the Bankruptcy Court found, Agra failed to expeditiously process Central's requests for Change Orders, and sometimes urged Central to begin work prior to the formal approval of a Change Order. (Dkt. 1, at 45, 52).

The court also found that the record was unclear as to how the parties closed out the contract, with both parties failing to adhere to the formal punch-list process spelled out in the Subcontract. (*Id*. at 48, 62).

On April 2, 2008, Central requested Change Order 18A, seeking to change the water treatment plant work from a fixed price to payment for its time and materials. The request was not promptly addressed by either Agra or the plant owner, and Central was not paid for its claims. The court noted the directly conflicting evidence on the issue.

> There is a significant conflict in the evidence regarding who made what oral commitment concerning payment for the water treatment facility work. The evidence of oral representations about payment without change orders is consistent with the frenzied efforts of the parties to complete the Superior plant, but it is not necessarily evidence of an enforceable oral modification of the contract. Central was well-aware of the possible adverse consequences of undertaking non-scope work without a change order, as was Agra.

(*Id*. at 54).

With approved Change Orders, the maximum contract price was $12,870,254, and Agra paid Central or Central's subcontractors $12,568,340. Rejecting Central's claim that Agra overpaid one of the subcontractors (thereby increasing the obligation remaining), the Bankruptcy Court determined that Agra owed Central a further $301,914 for its Superior work, which was substantially complete on July 16, 2008, with the court inferring the owner's October 22, 2008 settlement of contractor claims as equivalent to Agra's acceptance that the underlying work had been accomplished.

However, the court denied Central's $1,136,608 claim for the economic impact to the delays allegedly caused by Agra or Delta-T. This claim includes the cost of additional overhead for the time spent on the site past the completion date, the costs to install late-delivered valves, and accelerated labor costs due to the late deliveries.

For claims of excusable delay, if Central sought more time to complete the work or additional compensation based on excusable delay, it was obliged under § A.4.1.7 to submit a Delay Notice within seven days of the event causing delay, and a Delay Claim within fourteen. Claims for additional compensation due to an increased scope of work (such as the water treatment plant) require that the notice occur within 21 days of the increase in scope *and* prior to beginning any of the additional work (§ A.4.1.5).

Central, however, waited some five months before first giving notice of the missing Delta-T valves. Subsequent notices were also untimely. Accordingly, its claims for increased labor costs and for extended overhead failed for lack of compliance with §

A.4.1.5. Central's claims for out-of-sequence costs were untimely under § A.4.1.7. The court summarized the fatal omission:

> Central failed to comply with the notice and claim process set forth in §§ A.4.1.7 and A.4.1.5 in pursuing any of its impact claims. Central performed work for which it now claims additional costs without giving notice or filing a claim. Except for the water treatment facility work, Central submitted no change orders for the additional costs that make up the impact claim and Central performed that work prior to and without an executed change order. As to the water treatment facility, Central received a lump sum change order, but not an approved change order to do the water treatment work on a "time and materials" basis. In the absence of an executed change order as Article 5 of the subcontract and Article 4 of the Terms and Conditions required, the GMP was never modified.

(Dkt. 1, at 72-73).

The court also rejected Central's claim that Agra breached the subcontract with respect to disputed or disallowed Change Order requests. While the court agreed that in many instances Agra failed to promptly resolve Change Order requests, Central failed to show that the requests were meritorious, and failed to use the remedies of either declining the extra work or using the dispute resolution procedures spelled out in the Subcontract. In other words, Central failed to meet its burden of proof of showing a breach of an implied convenant of good faith and fair dealing. Further, the court found that Agra's failure was technical in nature, and was not a material breach of the contract. Finally, the court concluded that Agra never waived the requirement for written Change Orders.

In contrast, the court found that Central's claim for the value of its unpaid water treatment plant costs were "amply supported" by evidence showing that Agra had

encouraged Central to proceed with the project, thereby entitling Central to compensation under the doctrines of waiver, quantum meruit, or equitable restitution.

While Central and Agra were working through the delays at the Superior Project, they entered into a Subcontract for the construction on another biofuels plant, known as the Plymouth Project, at Merrill, Iowa on October 15, 2007. Plymouth was essentially identical to Superior, and Central's work was similar to the work required at Superior.

The Subcontract is premised on a standard form AIA Document A401-1997 contact, and is generally similar to the Superior Project Contract, with some exceptions. Unlike the earlier project, the Plymouth Subcontract provided that Central would receive a fixed fee for its work. With the change orders eventually approved by Agra, the contract provided that Central would receive a total $13,073,687 as its payment. This total would be paid through installment payments, representing the percentage of the overall work completed during a given month.

Central was obliged to submit payment applications "supported by such data substantiating the ... right to payment," which Agra could accept or reject within ten days. The Subcontract gives Agra the right to withhold payment if the amount of work completed could not be substantiated, and ask Central for further documentation. As the Bankruptcy Court construed the Subcontract (Dkt. 1, at 35), Agra was obliged to issue payment within 45 days of the time it certified payment.

Central was required to give Agra three days written notice of any delay it attributed to either Agra or the plant owner under § 3.4.1, and provided that "[f]ailure to

give timely notice shall be deemed to waive extension of time." Section 8.3 of the General Conditions portion of the Subcontract provides that, for delays outside Central's contract, it was required to submit a claim within 21 days of the event causing the delay.

The Subcontract provided that the time of substantial completion of the project could be extended only by approved Change Orders. In addition, it provided that any modifications would occur only by signed written agreement. Modifications were to be made through Change Orders, which reflected any alteration in the schedule or payment amount.

If Central experienced a delay through no fault of its own, it could obtain a deadline extension by submitting a written notice of the delay within three days of the event (§ 3.4.1), and a delay claim within 21 days (§ 4.3.7.1).

Section 7.3 expressly gives Agra the right to unilaterally suspend Central's performance for any reason. In contrast, § 4.7.1 gives Central the right to suspend performance only for non-payment. The Subcontract did not give Central the right to suspend performance for other reasons.

If Central neglected to complete the work required under the contract, § 3.4.1, authorized Agra to send notice of this default, and if the matter was not remedied within three days, Agra could "make good such deficiencies and may deduct the reasonable coast thereof." If Agra had to hire a replacement Subcontractor, Central was obliged by § 3.4.1 to pay Agra's costs along with a 15 % fee. In addition, under § 7.2.1, if Central "persistently or repeatedly fails or neglects the Work," and, within seven days of written notice by Agra

10

"fails ... to commence and continue correction," Agra was authorized to "terminate the Subcontract and finish the ... Work by whatever method [it] may deem expedient," with Central responsible for the remedial costs.

The designer, Delta-T, promised better performance at Plymouth, but this promise was quickly found to be hollow. These delays by the project designer in delivering valves and vessels for installation combined with bad winter weather to significantly delay construction at Plymouth.

Central requested several change orders to Agra, which approved some changes by marginally increasing Central's deadline. Otherwise, Agra refused or failed to act on the requested changes, complaining that Central had half the workers needed at Plymouth. Relations between the parties broke down, and Agra sent notice on June 6, 2008, that Central had neglected to complete the scope of its work under § 3.4 of the Subcontract.

On June 18, Agra's Project Director e-mailed Central, stating

[Agra] has been asking for a manpower loaded schedule from CSMI and has not received one to date.... I have requested and not received your recovery plan on how you are going to finish this plant. Your supervision has requested a crew of 75 people and today you are just over 40. Your crew size has only hit 60+ for a few days. This is crunch time. I am used to seeing piping crews in the 75-100 or more at this time. working two shifts. You have many areas that can be worked in but are lacking crews.... I would suggest that you immediately double your crew and add a night shift.... Please get back to me with your recovery plan. Time is of the essence.

On June 20, Central submitted Payment Application 10, certifying that the work was 92% complete, and seeking a payment of $872,339.

Agra sent a second delay notice on June 24, 2008, stating that Central had failed to adequately support the project, and stating that it would reassign the work unless Central submitted a plan to address the problem. Central indicated at a contractor's meeting on June 24, and a memo to Agra on June 27, that it would add a night shift. However, Central also indicated that there were "about 20 weeks of piping work left at our contracted pace, which would support an initial grind date of November 12th," and stating that it would need an additional $258,300 from Agra in order to meet Agra's scheduled August 29 completion.

On June 30, Agra rejected the request for additional payments or for modification of the completion date. And Dave Burgess, Agra's Project Director largely rejected the Payment Application 10 for lack of supporting documentation, approving $96,138 of the requested amount. The remainder was rejected for lacking support, and Agra asked for markups of the attached Process and Instrument Drawings to document the level of completion. Burgess did not believe Central's work was 92% complete, based on how the Plymouth Plant appeared, in contrast to the then-completed Superior Project. In addition, Burgess had recently received a separate letter from Central, in response to the request for increased manpower, indicating that it estimated it had about 20 weeks of work left on the project.

On July 7, 2008, Central left the work site. It gave notice that it was "suspending" its work later that same day, for Agra's handling of Pay App 10. Burgess tried to contact

Central, but his calls were not returned. Central never sought to resolve its claim under Payment Application 10 through the Subcontract's dispute resolution procedure.

Central argued before the Bankruptcy Court that Agra's reported concern about the completion level was pretext which it used to pressure Central, and that those concerns were contradicted by Agra's contemporaneous billing certifications to Plymouth Energy, the plant owner. Agra rejoined that its certification to Plymouth was prompted solely by the need to maintain a cash flow for the project, and that it indeed believed Central had completed 92% of the project. The court observed that "Agra's 'explanation' of this is, to say the least, interesting," but reviewed the evidence and ultimately accepted Agra's position. (Dkt. 1, at 96). Reviewing the history of Central's Payment Applications, the court found corroboration for Agra's position.

> Agra paid all of those applications, even though it was behind with the owner, dispelling Central's notion of inappropriate leverage by Agra.... Burgess partially rejected other payment applications and required correction of challenged items. Agra typically paid Central on its payment applications 30-40 days from the date of Central's application. The last payment application approved and paid, Pay App 9 in the amount of $933,018, was dated May 19, 2008, approved by Agra on May 23, and paid June 26, within the 45 days allowed under the Subcontract. The evidence shows that some ten days later, rather than supply the documentation requested by Agra to justify the completion percentage on Pay App 10, Central walked off the job.

(Dkt. 1, at 98-99 (footnotes omitted)).

Agra terminated the Subcontract, and hired Wanzek, another subcontractor, to complete the project. That subcontractor later indicated that it completed 38% of the work at the project, and that Central had completed approximately 58%.

The Bankruptcy Court held that Agra's partial rejection of Payment Application 10 was not a material breach of the contract, permitting Central to suspend its performance. First, it stressed that §§ 9.4.2 and 9.5.1 of the Plymouth General Conditions "permitted [Agra] to withhold approval of the payment application and issuance of the certificate for payment [and] Agra did exactly that." (*Id.* at 107). Second, as Agra was obligated under the Subcontract to make payments within 45 days, "Agra's payment was not yet due at the time Central walked off the job." (*Id.*)

In addition, the Bankruptcy Court also rejected Central's argument that the partial rejection of Payment Application 10 was a breach of Agra's implied duty of good faith and fair dealing. Stressing that the implied covenant will not vary explicit contractual rights, the court held that Agra's insistence of further corroboration for Payment Application 10 was consistent with its contract rights and with the evidence, in particular, with the photographic evidence showing the state of the plant. Rather than acting in bad faith, the court found that Agra "acted reasonably in soliciting Central to substantiate its completion percentage," (Dkt. 1, at 113).

Indeed, the court suggested that any bad faith might be more properly attributed to Central rather than Agra, noting the conjunction of Central's serious financial problems, its knowledge of the ongoing delays and deadlines, the fixed contract payment for the Plymouth Project, and the looming additional costs if it tried to meet the scheduled deadline:

> Central's site superintendent admitted to [Agra Site Superintendent Eric] Soder that Central could not get the necessary manpower to meet the schedule. Rather than take a further financial hit by staying on the project and completing the subcontract work (assuming that it could have obtained the manpower), Central simply quit; it cut its losses. Central never explained why it failed to supply the requested documentation to substantiate its completion percentage on Pay App 10. It had just been paid on Pay App 9, days before Pay App 10 was partially rejected and days before Central walked off. The Court is left to wonder ... perhaps Central knew that it was not 92% complete on its work?

(Id. at 114-15 (footnotes omitted)).

Next, the Bankruptcy Court determined that the Subcontract did not authorize Central to "suspend" performance. The only potentially applicable provision, § 4.7.1, permits stop work in the event of non-payment, requires that the non-payment be "through no fault of the Subcontractor," and requires seven days written notice. The court found that neither requirement was met. Further, as Agra was entitled to require additional documentation under the Subcontract, its partial rejection of Pay App 10 was not a material breach which would justify Central's walk-off, and in any event, under the terms of the Subcontract, compensation for Pay App 10 was not due for a full 45 days after its submission.

Instead, the court determined that Central's July 7 walk-off was a material breach within the meaning of Restatement §§ 241 and 242, given its failure to offer any assurances of further work, the contract's provisions emphasizing the avoidance of delay, the failure of Central to supply timely notice of delays, and the cost to Agra of securing a replacement. Summarizing Central's actions, the court concluded: "This behavior does not comport with

the standards of good faith and fair dealing." *Id*. at 118. In light of the material breach, Agra was justifying in terminating the contract, and was entitled to damages in the amount of $3,088.259.[1]

In addition, in light of Central's material breach, the court determined that Central was not entitled to recover on its claims for demobilization costs and the $2.481 million unpaid balance of the Subcontract, and was not entitled to its claims of unreimbursed sales taxes and delay costs for its failure to show that any timely claim under the Subcontract. Central was entitled to recover as damages only the portion of Pay App 10 which Agra approved but never paid, in the amount of $96,138, with interest.

### Conclusions of Law

Central first claims that the Bankruptcy Court erred in finding that the notice provisions of the Superior Subcontract bar its claims for damages in excess of the explicit $11.9 million Guaranteed Maximum Price. It argues that the Bankruptcy Court erred in holding that the general contract's Terms and Conditions time limitations controlled over

---

[1] Agra incurred an additional $ 6,112,6899 to finish the work after the walk-off, reflecting payments to Wanzek and other companies, together with a 15% fee on the Wanzek payment pursuant to the Subcontract. With the $9,953,247 it had previously paid to Central, Agra thus paid a total of $16,065,946 to complete Central's portion of the work, while the Subcontract anticipated a maximum charge of $13,073,687. Agra's damages reflect those increased costs together with $96,000 in liquidated damages under §§ 3.4.1 and 9.3 of the Subcontract.

the Superior Subcontract, erred in equating a "claim" for damages with the requirement for timely Change Orders and thus "simply failed to read the Subcontract *in pari materia*," erred in failing to recognize the Change Order process was futile, and erred in ignoring Agra's alleged breach by delay. The court finds that these arguments fail to demonstrate error.

Far from ignoring the context and language of the Subcontract, the Bankruptcy Court fairly and accurately reviewed all relevant provisions in detail. (Dkt. 1, at 17-29). In absence of approved Change Orders, the most  Central could recover under the Subcontract was its "Cost of Work" plus 12%, up to the $11.9 million GMP. The Subcontract could only be modified by written agreement (§ 13.6.1), and Change Orders required both request and approval to be in writing (§ 12.1.8). Section 5.2 of the Subcontract required Central to submit Change Order requests "promptly" and "prior to the commencement of such changed or revised work," and § 5.3 further specified that any claim that would become a part of Agra's claim under the Prime Contract with GPRE must be made "in sufficient time to satisfy the requirements of the Prime Contact," and "not less than two working days preceding the time by which the Contractor's claim must be made."

Section 5.3 thus directly incorporates, as the Bankruptcy Court found, the Prime Contract's Terms and Conditions for the submission of claims. In addition, the Prime Contract's terms were explicitly incorporated by § 1.1 (which provided that "The Subcontract Documents consist of ... the Prime Contract"); by Article 21 (which lists the "Terms and Conditions" of the Prime Contract as part of the documents making up the

17

Subcontract); and implicitly by § 2.1, which required Central to act to Agra, as Agra acted to GPRE under the Prime Contract. The Bankruptcy Court, after a careful review of all relevant contract language, concluded that the Terms and Conditions of the Prime Contract, including the explicit notice requirements of §§ A.4.1.5 and A.4.1.7, applied to the Subcontract. This decision was correct.

The Bankruptcy Court also determined that Central failed to prove that it met these timing requirements. After reviewing the evidence, it concluded:

> It is impossible to "match up" Central's claimed days of delay with the series of claims that Central filed beginning in November of 2007.... Central had the burden of proving the dates of the trigger events and that it timely noticed those events to Agra. Because it failed in that proof, the Court concludes that the November, 2007 Delay Claims were untimely noticed and filed and must be denied.

(Dkt. 1, at 67). This factual determination is supported in the evidence, as is the Bankruptcy Court's determination that Central had failed to demonstrate timely notice as to increased costs due to acceleration of the project, the costs attendant on the extended duration of the project, or the costs of performing work out of sequence. (*Id*. at 71-72).

Central suggests that the failure to timely follow the procedures for Change Orders was simply a "technical breach," that timing requirements are unenforceable, or that attempts to comply with the procedures would have been futile. (Dkt. 24, at 53-54). However, ample evidence supports the Bankruptcy Court's factual determination that, as design-build projects involving innovative biofuels technologies, the parties directly

anticipated delays, and the Change Order procedures played a vital role in dealing with them. (Dkt. 1, at 76).

Central has failed to show that compliance with Change Order process would have been futile. When it did use the Change Order procedures, Central was able to obtain relief. Agra actually approved most of the Change Order requests that were submitted, and, as the Bankruptcy Court noted, Agra actively "assisted and encouraged Central in submitting delay claims." (*Id*. at 79).

This court finds that the Bankruptcy Court did not err in determining that the Change Order procedures were valid and enforceable. *Nicodemus v. Milwaukee Mutual Insurance*, 612 N.W.21d 785, 786 (Ia. 2000), cited by Central, has little relevance to the present action. In that case, the court found unenforceable policy language which had the practical effect of nullifying underinsured motorist protection. The case was decided under Iowa insurance law, which requires that limitations for policy claims must be reasonable. 612 N.W.2d at 787. The court found that, under the policy language in question,

> the insurance company is requiring not only that the insured investigate her tort claim and file suit within two years, but also that she *conclude* her litigation against the tortfeasor *and* file an action against her insurer within that same two-year period. Thus, the policy makes exhaustion of the tort claim a condition precedent to suit against the insurer, yet starts the limitations period without regard to whether exhaustion has occurred.

*Id*. at 788 (emphasis in *Nicodemus*).

Central's claims are not those of an insurance policyholder. Both Central and Agra are sophisticated and experienced commercial enterprises, and their dispute centers on the

interpretation of a contract for millions of dollars worth of highly technical construction work. *Nicodemus* addressed insurance policy language which could blindside a consumer whose claim for damages could be barred "before the insured has ascertained the extent of her underinsured damages." 612 N.W. 2d at 788. Thus, even an alert and vigilant policy holder could be prevented from seeking recovery. *See also Robinson v. Allied Property & Casualty Insurance*, __ N.W.2d __, 2012 WL 2498819 (Ia. June 29, 2012) (upholding two-year limitation in policy for UIM action, stressing that "[t]he contractual limitations provision in [*Nicodemus*] required the insured to *conclude* her tort action by settlement or judgment before filing her UIM suit within two years of her accident").

Here, Central is not precluded from litigation; it simply faces the consequences of its own bargained-for construction contract, under which it was obliged to present timely notices of delays or costs increases as conditions precedent to a successful claim. Central makes no argument that it was *unaware* of the delays or that it was *unable* to comply with the Change Order procedure.

Finally, Central suggests that the Bankruptcy Court confused its "claim" for impact damage with the process for obtaining agreed Change Orders. However, Central's argument (Dkt. 24, at 53-54), rests on reading certain portions of the Subcontract out of context. For example, it cites § A.4.1.1 of the Terms and Conditions, which provides: "A Claim is a demand or assertion ... seeking ... payment of money, extension of time or other relief," and argues that the use of the term "demand" suggests that some claims may fall outside the scope of the agreed Change Order process.

Central's argument depends upon reading a limited portion of the Subcontract in isolation, ignoring those provisions supporting the Bankruptcy Court's interpretation. Thus, § A.4.1.1 itself proceeds to specify that all claims "must be initiated by written notice," and that "[t]he responsibility to substantiate Claims shall rest with the party making the Claim." Further, Section A.4.1.5 expressly subjects "claims" to the Change Order process:

> Contract Sum or GMP, other than a Claim for a concealed or unknown condition which is governed by Paragraph A.4.1.4 of these Terms and Conditions, written notice as provided herein shall be given before proceeding to execute the Work. Prior notice is not required for Claims relating to an emergency.... Any Claims as described herein shall be subject to the Change Order provisions set forth in Article A.7.

The Bankruptcy Court correctly determined that the Change Order process was the only means under the Superior Subcontract by which Central could materially alter the amounts recovered or the time for performance.

Central argues that its obligation to abide by the Subcontract's dispute resolution procedure was excused by Agra's delays in providing necessary equipment and designs. The court rejects this allegation of error for two reasons. First, as the Bankruptcy Court correctly found, the delays cited by Central do not amount to a breach. To the contrary, the parties actively contemplated the likelihood of delays in the design-build construction of the plant, and crafted the dispute resolution procedure to address such delays. That procedure included deadlines for both delay notices and delay claims.

The breach of a contract is a question of fact under Iowa law. *See Kern v. Palmer College of Chiropractic*, 757 N.W.2d 651 , 664 (Ia. 2008) (citing RESTATEMENT (SECOND) OF CONTRACTS, § 766 cmnt. o); *Junkin v. Hargrove & Arnold*, 196 Iowa 1387, 195 N.W. 217 (1923) (existence of breach of contract "essentially a fact question"); *Wichita Clinic v. Louis*, 39 Kan.App.2d 848, 868, 185 P.3d 946 (2008) (reaching same result under Kansas law). The Bankruptcy Court explicitly determined that Agra's delays did not force Central to abandon the requirement for timely notice of delays. To the contrary, while Agra failed to expeditiously process Central's delay claims, the court stressed that

> it is apparent that Central performed the work before it submitted the change order and attempted to paper up the change order after the fact. In itself, this would be a basis for Agra to reject the change order. Likewise, if the change order proposed work that Agra believed was within Central's scope, it would be appropriate for Agra to reject it. [S]itting here today, the Court is not in a position to address the "merits" of Agra's rejection or cancellation of these disputed change orders without more evidence concerning the nature of the work and the reasons for Agra's rejection or cancellation, all matters that lay within Central's burden of proof. [Given] the current state of the evidentiary record, the Court cannot conclude that Agra breached the implied covenant of good faith and fair dealing with respect to these "disputed" change orders.

(Dkt. 1, at 75-76). The court determined that Central had failed to prove the existence of any breach by Agra, and this factual conclusion is not clearly erroneous.

Second, even if Agra's actions could be construed as a breach, it was at best "technical non-compliance," and was not a material breach which would excuse Central's complete abandonment of the Subcontract's Change Order dispute resolution procedure.

(*Id*. at 76). The Bankruptcy Court reached this conclusion of non-materiality based on the

central importance of the Change Order, finding:

> the change order process serves an important function. It enables Agra to
> ascertain whether the change order is for out-of-scope work and to review
> the proposed cost. This allows Agra to determine whether to use the claimant
> or another contractor for the added work. At the same time, the change order
> process also protects subcontractors. They have no duty to proceed with
> change order work without securing an approved change order. Thus, by
> complying with the change order process set out in the contract, Central
> could have avoided the risk of performing the work and not getting paid.

(*Id*.)

Whether a given breach is material, courts may consider a variety of factors,

including those specifically mentioned as significant in § 241 of the RESTATEMENT (SECOND)

OF CONTRACTS:

> (a)   the extent to which the injured party will be deprived of the benefit
> which he reasonably expected;
>
> (b)   the extent to which the injured party can be adequately compensated
> for the part of that benefit of which he will be deprived;
>
> (c)   the extent to which the party failing to perform or to offer to perform
> will suffer forfeiture;
>
> (d)   the likelihood that the party failing to perform or to offer to perform
> will cure his failure, taking account of all the circumstances including
> any reasonable assurances;
>
> (e)   the extent to which the behavior of the party failing to perform or to
> offer to perform comports with standards of good faith and fair dealing.

*See Van Oort Construction v. Nuckoll's Concrete Service*, 559 N.W. 2d 684, 692 (Ia. 1999)

(following RESTATEMENT ). As with the existence of the breach itself, whether a given

23

breach is material is also factual question. 23 Richard A. Lord, WILLISTON ON CONTRACTS § 63:3 (4th ed.1992) ("[t]he determination whether a material breach has occurred is generally a question of fact"). *See generally O'Connell Management Co. v. Carlyle-XII Mangers*, 765 F.Supp. 779, 783 (D. Mass. 1991) (citing E. Farnsworth, *Contracts* § 8.16 (1990); J. Calamari & J. Perillo, *The Law of Contracts* 409 (1977); RESTATEMENT (SECOND) OF CONTRACTS § 237 (1981)).

The Bankruptcy Court's determination that Agra's actions were not a material breach is not clearly erroneous. As that court noted, Central could have protected itself by vigorously advancing notices and claims under the Change Order process, and by refusing to perform additional work in the absence of agreed Change Orders. With the exception of the additional work for the water treatment plant, Central has failed at its burden of proving why the explicit Change Order procedure should be abandoned. Delays were expected in the project, and they were to be managed through the Change Order process The Bankruptcy Court determined that Agra did not act in bad faith, and this court finds no basis for deeming clearly erroneous the determination any breach by Agra was technical rather than material.

As noted earlier, the Bankruptcy Court found for Central on its claim for the additional costs for the water treatment plant, under the doctrines of waiver, *quantum meruit*, or equitable restitution. (Dkt. 1, at 80-85). Central argues that the court erred in failing to also apply these doctrines to its general claim for economic impact damages. Again, this court finds no error.

Iowa law recognizes that written change order requirements may be waived, if the party claiming waiver can demonstrate knowledge and consent by the other party. *See Central Iowa Grading v. UDE Corp.*, 392 N.W.2d 857, 860 (Ia. Ct. App. 1986). The Bankruptcy Court here reasonably distinguished Central's general economic impact claims from the water treatment plant claim. With respect to the water treatment plant, the work was clearly outside the scope of the original Subcontract, was governed by the separate and explicit agreed Change Order 56, and there was evidence supporting a finding that Agra waived the Change Order for the water treatment plant. (Dkt. 1, at 82). However, there was a corresponding absence of proof that Agra knowingly consented to any relaxation of the Change Order requirement for the Superior Plant as a whole. As to those claims, the Bankruptcy Court stressed that Agra attempted to help Central submit proper Change Order requests, and that, notwithstanding the contract's provision that such work was at its own peril, "Central performed the work before it submitted the change order and attempted to paper up the change order after the fact." (*Id*. at 75).

Central's general economic impact claims arise from its claims of the extra cost it allegedly incurred in performing the scope of work contemplated under the original Subcontract. As such, those claims fall directly within the Superior Subcontract's explicit maximum cost provision, and Central can recover additional costs only by showing an agreed Change Order. The Bankruptcy Court determined that Central "failed to meet its burden of proving ... a waiver whether orally or by course of dealing." (*Id*. at 80). The claim for the water treatment plant work "stands apart" from the remainder of Central's claims,

25

the Bankruptcy Court stressed, because it was "amply supported by evidence that Agra and the owner waived the change order requirement." (*Id.*) The court finds that the factual conclusion that Agra had not waived the requirements of written modification is not clearly erroneous.

Similarly, Central's economic impact claims find no support in the doctrines of *quantum meruit* and equitable restitution, failing in light of the explicit contractual provisions limiting the amount recoverable in the absence of a written modification by agreed Change Order. "Express and implied contracts cannot ... coexist on the same subject matter, and where an express contract and implied contract purport to cover the same subject matter, the former supersedes the latter." *Cy & Charley's Firestone v. Running*, No 11-0211, 2011 WL 6668039, *6 (Iowa App. Dec. 21, 2011). The doctrines of *quantum meruit* and equitable restitution arise in the absence of a formal contract. *See respectively Giese Construction v. Randa*, 524 N.W.2d 427, 431 (Ia. Ct. App. 1994); *Iowa Network Services v. Qwest Corp.* 363 F.3d 683, 694 (8th Cir. 2004) ("Iowa courts refuse to imply a contract where an express contract exists"). Here, the parties defined their obligations under an explicit and detailed written contract, and its provisions are controlling.

Central contends that Agra breached the Plymouth Subcontract by its delays, and that Central was therefore entitled to the common law remedy of suspension of performance; it argues that the Bankruptcy Court failed to recognize this right because it "mistakenly ruled that Central States had none of the rights and remedies available at common law for breach of contract." (Dkt. 24, at 65).    Central's argument fails because the

Bankruptcy Court did not refuse to consider Central's argument. Rather, it concluded that Agra did not breach the Subcontract, Central did. This decision is not clearly erroneous. That is, as the Bankruptcy Court observed, "[i]*n the absence of a material breach by Agra,* Central was not justified in suspending its performance of the subcontract." (Dkt. 1, at 118) (emphasis added).

The parties here actively considered the likelihood of delays in the construction, and indeed, by the time of the Plymouth Project, the parties had specific experience in the frustrating delays endemic to the Superior Project. Notwithstanding these delays, the parties entered into the Plymouth Project on roughly the same terms. However, as with the Superior Project, Central failed to avail itself of the explicit contractual remedy of submitting Delay Claims pursuant to the Subcontract. (*Id.* at 119). The delays were thus not material, since they were both anticipated and did not prevent Central from complying with its contractual duty to operate within the contractual framework of modification by Change Order.

Central's argument founders on both the Bankruptcy Court's factual determination that Agra did not materially breach the Plymouth Subcontract, and by the Subcontract's explicit restriction on self-help remedies. Section 7.3.1 explicitly authorizes Agra — not Central — to suspend performance under certain circumstances, provided it give Central "an equitable adjustment" in time and money. Further, Section 4.7.1 gives Central a limited ability to suspend performance, but *only for nonpayment.* The Bankruptcy Court reasonably

construed these provisions as limiting the right of suspension of performance by Central. (Dkt. 1, at 116-117).

Next, Central contends that the Bankruptcy Court erred in determining that Agra did not violate the duty of good faith and fair dealing. It supports this argument by recycling its Proposed Findings of Fact and Conclusions of Law originally urged on the Bankruptcy Court (Dkt. 24, at 71), coupled with the claim that the same court "found that Agra acted dishonestly and in bad faith at the very beginning of the Subcontract," and "made express findings that Agra had not dealt with Central States fairly and in good faith." (*Id.* at 72, 73).

In truth, the Bankruptcy Court made no such findings. At the cited portions of the opinion, the Bankruptcy Court indicated instead that Agra dealt with Central's Change Order requests in a "less than responsive" fashion, but the court also found that Agra had acted to clarify the procedures for Change Order requests, and explicitly determined that Agra's interpretation of those procedures was correct. (Dkt. 1, at 90, n. 290). Further, the Bankruptcy Court expressly noted actions by Agra indicative of dealing in good faith, including its prompt payment of the first nine Payment Applications, and the photographic evidence "speak[ing] louder that any testimony the Court heard," showing that Central's Application 10 progress claim was grossly overstated. (Dkt. 1, at 112). Indeed, the Bankruptcy Court suggested that Agra evidenced better faith than Central in its actions. After noting the financial bind facing Central when the dubiously-supported Payment Application 10 was provisionally rejected, the Court stressed:

> Central simply quit; it cut its losses. Central never explained why it failed to supply the requested documentation to substantiate its completion percentage on Pay App 10. It had just been paid on Pay App 9, days before Pay App 10 was partially rejected and days before Central walked off. The Court is left to wonder . . . perhaps Central knew that it was not 92% complete on its work? Central's walk off was far more injurious to Agra's ability to complete the Plymouth project than Agra's partial rejection of Pay App 10 was to Central.
>
> In short, the duty of good faith and fair dealing implied in contracts runs both ways. Central had the same obligation as Agra to perform its contractual duties with good faith. That duty included Central's obligation to accurately state its percentage of completion and to substantiate that completion percentage when requested by Agra.

(Dkt. 1, at 114). The Bankruptcy Court's findings that Agra did not violate the implied covenant of good faith and fair dealing are supported by substantial evidence and are not clearly erroneous.

As noted earlier, in addition to largely rejecting Central's claims for damages, the Bankruptcy Court also found in favor of Agra on its claims for damages due to Central's walking off the Plymouth Project. Central argues that the Bankruptcy Court erred because the evidence at trial fails to support the amount of damages awarded.

This Court finds no error, as the findings of the Bankruptcy Court are fully supported by evidence from both Agra (through its project manager, Dave Burgess) and Wanzek (through its project superintendent Craig Pumper) showing how much the former was obliged to pay the latter for completion of the Plymouth work once Central walked off the job. Specifically, Agra was forced to pay Wanzek $4,604,610 to complete the job. Under Section 7.2.1, this amount is subject to a 15% surcharge based on Central's "repeated fail[ure] to carry out the Work." Together with additional remedial costs to Agra of

29

$817,398, the Bankruptcy Court correctly determined that the walkoff forced Agra to pay $2,992,259 in excess of the maximum payment authorized to Central under the Subcontract.

Finally, Central argues that the Bankruptcy Court erred in failing to award it attorney fees under Section A.13.13.1 of the Superior Subcontract, which provided that such relief may be extended to the "substantially prevailing party." Central argues that such relief is appropriate, given the Bankruptcy Court's finding in its favor on some of its claims — that is, (a) $302,00 for the unpaid balance of the Superior Subcontract, (b) $242,000 for work on the Superior water treatment building, and (c) $5100 in progress payment interest. The court finds no error.

As the Bankruptcy Court noted, Agra never substantially contested the first or last of these claims, and Central's main claim of $1.134 million in impact damages was rejected by the court. As a result, Central succeeded on only a third of its claims. (Dkt. 1, at 128).

Further, this fraction only reflects the Superior Subcontract portion of the case. The Bankruptcy Court awarded $2.9 million to Agra for its damages due to Central's walkoff from the Plymouth Project, or roughly ten times Central's recovery for the water treatment building work at Superior. The Bankruptcy Court separately determined that under 11 U.S.C. § 553, Agra was entitled to set off its Plymouth claim against any award to Central arising the Superior Project, and Central does not challenge this ruling as error in its appellate brief. Central cannot be considered a prevailing party when, at the end of the day, its actual recovery is zero.

IT IS ACCORDINGLY ORDERED this 7th day of September, 2012, that decision of the Bankruptcy Court is hereby AFFIRMED in all respects.

s/J. Thomas Marten
J. THOMAS MARTEN, JUDGE.